**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| BENITA SHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-235-PPS |
| | ) | |
| BEACON HEALTH SYSTEM, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Benita Shaw is suing her former employer, Beacon Health System, Inc., for allegedly discriminating against her because of her disability in violation of the Americans with Disabilities Act. She tells me that after successfully working at one of Beacon's hospitals for more than two decades, she was told to reapply for her job then denied the position because Beacon wanted someone who wasn't disabled to do the job. She says this constitutes two violations of the ADA: (1) disability discrimination, and (2) a failure to accommodate. Beacon, for its part, denies any wrongdoing and seeks summary judgment on both claims. Shaw has also moved for summary judgment but only on her the failure to accommodate claim. My review of the evidence in this case shows that there are some big disputed issues of fact which I cannot resolve. Beacon's potential liability must be determined by a jury through a trial on the merits. Accordingly, I will deny both motions for summary judgment.

**Background**

Shaw is a Registered Nurse and worked for Beacon at Elkhart General Hospital for more than two decades. She began working at the hospital in 1995 as a Floor Nurse, responsible for taking care of patients. In 1997, she was promoted to Charge Nurse, a position which, in addition to patient care, involved administrative responsibilities for other nurses, assignments and incoming patient evaluations. In 2002, she became a Nursing Supervisor, a mostly administrative and supervisory position. In 2006, she was promoted to Shift Coordinator for Nursing Support Services, which was also primarily administrative in nature and responsible for staffing nurses throughout the hospital on an as-needed basis. In this job, her primary responsibilities were scheduling, payroll, and other administrative tasks to assist the Nursing Director at the hospital. But in the summer of 2017, she was told she would not be retained for the position of Shift Coordinator, the position that she had worked in for approximately 10 years. [*See* B. Shaw Dep. at 30-35.]

Throughout her tenure at Elkhart General Hospital, Shaw had a medical condition known as Reynaud's Syndrome. She was first diagnosed with Reynaud's in 1981. This disease causes spasms in an individual's arteries, which then reduces blood flow to extremities, often the fingers. This causes discoloration and numbness, sometimes for minutes but sometimes for hours. These effects are generally triggered by a drop in temperature or otherwise cold conditions. Shaw was also diagnosed with scleroderma in 2005. Scleroderma is a disease which causes the hardening of connective tissue, in Shaw's case around her internal organs. Shaw's scleroderma affects her lungs,

making it difficult to breathe in cold temperatures, and it also causes digestive issues which can interfere with her nutrition, causing her to feel fatigued. [B. Shaw Dep. at 20-24.] The combination of these two conditions requires Shaw to be acutely aware of her surrounding temperature and requires her to make efforts to ensure she stays adequately warm.

As mentioned, when Shaw worked as a Shift Coordinator, her role was strictly administrative in nature. But it is undisputed that the written job description for Shift Coordinator contains additional responsibilities beyond what Shaw performed. Specifically, the "Job Summary" states that a Shift Coordinator is:

> Responsible for supporting the Nursing Director of the unit in administrative duties. Will provide leadership by collaborating with members of the health care team to maintain standards for professional nursing practice. Participates in organizational and unit-based performance improvement activities and provides input on standards of care. Able to provide patient care at the bedside or as charge nurse. Applies the nursing process utilizing Relationship Based Care framework. Establishes strong patient family relationships. Collaborates with other professional, clinical and ancillary staff in providing quality care to patients. Displays strong teamwork. Exhibits self-care and self-knowing in order to be empathetic and compassionate with every interaction.

[DE 32-3.] It is further undisputed that while the ability "to provide patient care at the bedside or as charge nurse" was part of the job summary, Shaw did not, in fact, provide bedside patient care or work as a charge nurse while she was Shift Coordinator. Neither party has suggested or presented evidence that Shaw's conditions impacted her ability to perform her administrative responsibilities as Shift Coordinator, which all parties agree constituted the bulk of a Shift Coordinator's professional responsibilities.

Nonetheless, Shaw received what she calls "informal accommodations" throughout her tenure at Beacon. She could keep a space heater at her desk, keep a microwave and refrigerator in her office (to avoid the cafeteria which apparently was quite cold), work from home at times, and park near the hospital instead of the employee parking lot (to avoid walking in from the cold and be able to remote start her vehicle from inside). [Shaw Dep. at 202-204.] Beacon also says that Shaw's condition was accommodated by not having her perform any of the hands-on patient care component of her job duties. [Roberts Aff. ¶ 11.[1]] According to Beacon, this is reflected in her 2017 performance review in which she had high marks generally but an "N/A" rating under "Patient Care Delivery." [*See* DE 32-2.]

Shaw disputes this. She says instead that the evidence shows that Shaw did not perform this aspect of her job description because she only worked less than full time (64 hours per pay period). Her supervisor conceded that because she didn't work full time, Shaw did not have time to perform patient care on top of her other responsibilities. [*See* Roberts Dep. at 21-24.] In any event, the parties agree that she did not perform this aspect of her job description prior to her termination in summer 2017, but they dispute why.

The end of Shaw's employment with Beacon began with an "organizational restructuring" of the hospital announced in June of 2017. [Spear Aff. ¶ 9.] Financial

---

[1] Shaw has moved to strike, *inter alia*, Paragraph 11 of Roberts' Affidavit. The Motion to Strike is discussed later in this opinion and to the extent any stricken portions of any affidavit is cited in this opinion, it is only for purposes of providing general background information.

losses at the hospital from decreased patient admissions and reimbursements, necessitated a reduction in the number of "nursing leadership positions" including Shift Coordinators. This then created the need for Shift Coordinators to be more efficient, *i.e.*, perform all the tasks listed in the job summary. This included being able to fill in as a treating nurse, such as a Charge Nurse, Nursing Supervisor or Patient Flow Coordinator. The job summary was unchanged, but Shift Coordinators would also have to begin working full time, although their primary responsibilities would remain administrative. [Roberts Dep. at 46, 53, and 102.]

This is where parties' stories really begin to diverge. On June 21, 2017, Shaw was told about the restructuring and that she would need to re-apply for her job. [Shaw Dep. 68-69.] Shaw began to think things over and determine whether she would be able to competently perform the job in its expanded role, specifically whether she would be able to fill in as a Patient Flow Coordinator or a Nursing Supervisor (the position Shaw held from 2002-2006). [*Id.* at 68.]

On June 26, 2017, Beacon says Shaw informed her supervisor Deanna Roberts that she was not going to apply for the job "because she would not perform the essential functions of the job because the position required physical exertion and direct-hands on patient care." [Roberts Aff. ¶ 16.] Nonetheless, Roberts says she encouraged Shaw to shadow a Nursing Supervisor to see whether Shaw could possibly still do the job. [*Id.* at ¶ 17.] After shadowing a Nursing Supervisor for four hours on June 28, Beacon says that Shaw became physically ill and reported to Roberts "that the job shadowing experience made her so sick that her lips and nose began to bleed." [*Id.* at ¶¶ 18-20.] The

following day, Roberts, Shaw and another member of Beacon management met. Shaw told them that "she physically could not work as a Nursing Supervisor or Patient Flow Coordinator." [*Id.* at ¶ 21.] But despite apparently telling Beacon that she could not physically do the job, Shaw applied for and interviewed for the Shift Coordinator position on July 11, 2017. Three days later, she learned she didn't get the job. [*Id.* at ¶¶ 22, 25.]

Shaw tells a story different from Beacon's. She admits that after learning that she would need to reapply and that the Shift Coordinator position would have additional responsibilities she had not previously done, she had some trepidations. Nonetheless she says she decided to try to continue on the job. So, she undertook the shadowing of a Nursing Supervisor on June 28, 2017 to see if she could do it. Afterward, she thought she could. Shaw says that Beacon mischaracterizes the toll the four-hour shadowing experience had on her. In her opposition brief, she says that her lips only began to bleed seven hours *after* she did the shadowing and that it was wholly unrelated to her Reynaud's nor caused by shadowing a Nursing Supervisor. But curiously, Shaw fails to cite any deposition or affidavit testimony supporting her version of events on this point [*see* DE 36 at 2-3], and so I cannot credit her version what happened there. In any event, Shaw confirms that after shadowing, she applied for the Shift Coordinator position, which seems to contradict Roberts statement that Shaw definitively told her that she couldn't do the job. After all, who would tell their supervisor one day they can't do a job and then apply for that very same position a few days later?

Shaw interviewed for the Shift Coordinator position on July 11 with a four-person panel, which did not include Roberts. Three of the four interviewers selected Shaw as their top choice for the Shift Coordinator position, and the fourth did not record any recommendation. [Roberts Dep. at 23-76.] Around this same time, Roberts encouraged at least one other Beacon employee to apply for the Shift Coordinator position. Terra Morauski testified that she was asked by Roberts to apply, but she was hesitant to do so because she did not want to compete against Shaw for the job. Specifically, she said, "I am so conflicted[.] I really want to talk to Benita and see what her thoughts are . . .   If she truly wants the position I don't think that I can interview as I would be running against her for her own job." [Morauski Dep. at 12, 17-18.] Morauski decided to interview for the position anyway.

Prior to either Morauski or Shaw interviewing, Roberts stated in an email that she preferred Morauski for the position. [Roberts Dep. at 76, 83.] After interviews, Morauski was offered the job. She apparently asked Roberts whether if she declined the offer, Shaw would get the job, and Roberts told her no. So Morauski accepted. [Morauski Dep. at 21-22.] The decision was announced on July 14 and Roberts told Shaw that "we are doing this for your health and your stress." [Shaw Dep. at 211.] In a subsequent email, Roberts also stated that "the influencing factor" in the decision was the need to have a Shift Coordinator cover floor nurse shifts and that previously in "all her duties assigned" Shaw had been a "great" Shift Coordinator. [Roberts Dep. at 76.] Roberts also testified prior to making her decision, she didn't speak with Shaw about possible accommodations which would have allowed Shaw to better fulfill the duties of

a Shift Coordinator. [*Id.* at 84.] Instead, she says she wanted someone who could "fill the role entirely as a shift coordinator and could clinically perform all the duties." [*Id.*] But as Shaw notes, since taking the Shift Coordinator position full time, Morauski testified that she had only filled in "here and there" in providing patient care by filling in as a Nursing Supervisor but never worked a full shift. [Mouraski Dep. at 11.] As was the case when Shaw held the same position previously, her focus has been on administrative matters.

With the door to the Shift Coordinator position closed by July 14, Beacon and Shaw tried to figure out if there was another job she could take within the organization. Shaw met with Lesley Heckaman, Beacon's Employee Health Manager, to discuss possible alternative jobs or formal accommodations for the first time on July 17. [Heckaman Dep. at 16.] During this meeting, Shaw was given a Medical Inquiry Form, to fill out which would formally document her disability. Shaw took the form to her treating physician (Dr. Minnie Enriquez), who filled it out and provided their assessment of Shaw's abilities and confirming her disability. One of the limitations noted in the June 21 statement by Dr. Enriquez is that Shaw was "unable to perform hands on nursing." [DE 31 at 10.]

The day after Shaw's meeting with Heckaman, Roberts told Shaw of an opening for the position of a Case Manager. On July 27, Shaw shadowed another Case Manager for half a day and afterwards Shaw stated that while shadowing her hands became severely numb and she said she couldn't do the job properly in that condition. But there is a dispute between the parties as to *why* exactly Shaw couldn't do the job. Beacon says

Shaw simply said she couldn't do the job with her disability and that was the end of the story. But Shaw says the problem was that she could not do the job without an accommodation from Beacon, namely she needed to have access to a heat source and be able to take short breaks to ensure her fingers stayed warm and didn't go numb, similar to what she did to keep warm from 2002 to 2006 when she worked as a Nursing Supervisor. When she shadowed the other Case Manager, she was not given the opportunity to take a break to warm her hands, and Shaw says that as a result she assumed taking such breaks wasn't an option or an accommodation Beacon was willing to give. In any event, Shaw did not apply to be or become a Case Manager.

Afterwards, Beacon looked within its organization for sedentary positions, but nothing satisfactory was found. [Spear Aff. ¶¶ 15-16.] Heckaman, the employee responsible for managing ADA accommodations, did not meet with Shaw again and testified that she only had a "small understanding" of the scope of Shaw's disability. [Heckaman Dep. at 18.] Nonetheless, Beacon says it looked for jobs, but Shaw simply didn't bother to apply for anything it identified. Shaw says this was nothing more than a sham, as Beacon only looked for jobs which required her to be sedentary, a restriction she neither needed nor requested. On September 1, Shaw was formally separated from her employment with Beacon and this lawsuit followed.

**Discussion**

Federal Rule of Civil Procedure 56 governs a motion for summary judgment. Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). To prevail, a party can either point to undisputed facts supported by evidence or point to an absence of evidence as to some element of the other party's claim or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Summary judgment should be denied "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Here, both parties are the movant and non-movant. Beacon has moved for summary judgment on both claims alleged, and Shaw is also a movant as to the failure to accommodate claim. When evaluating whether to grant summary judgment in either party's favor on the claims on which they have moved, I must view all facts "in the light most favorable to the non-moving party." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649 (7th Cir. 2014). In order for the non-moving party to prevail, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). Thus, if on any element of the cause of action in question, the non-movant can point to evidence supporting their position, summary judgment cannot be granted.

Before getting into the substance of the summary judgment motions, there is an initial kerfuffle about two affidavits that were submitted by Beacon in its summary

judgment papers. Shaw has moved to strike portions of those affidavits, and that is where I will begin.

## A. Shaw's Motion to Strike

The first step in any summary judgment decision is amassing the record evidence from which I must decide if there are questions of material fact. In general, judges rely on parties to marshal their own evidence in support of their arguments and while they usually disagree as to the importance or relevancy of certain evidence, the parties can agree as to what the universe of evidence is. Not so here. Shaw challenges portions of two affidavits submitted by Beacon in connection with its motion for summary judgment. Shaw says that portions of the affidavits of Cathy Spear and Deanna Roberts, both of whom are Beacon employees who were involved in this saga, are improper. Specifically, she argues that certain paragraphs contain legal conclusions, lack a factual basis based upon the affiant's personal knowledge, or contradict prior sworn deposition testimony from these very same witnesses. Because Shaw seeks to strike specific paragraphs and not the affidavits entirely, I will undertake the laborious task of marching through each of the specific paragraphs being challenged.

But first, let's review the governing law. Affidavits and declarations are familiar forms of evidence used to support or oppose a motion for summary judgment. Federal Rule of Civil Procedure 56(c)(4) specifically contemplates them. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). But like all testimony, if a witness does not have personal knowledge or a foundation to make statements, the affidavit testimony is not admissible evidence. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of truth of the matter asserted." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (quoting *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)).

Affidavits also cannot be used to "correct" or impermissibly fill in gaps in a witness's prior deposition testimony to prevail at summary judgment. Some judges call these "sham affidavits." Indeed, the Seventh Circuit has noted that "A 'sham affidavit' is an affidavit that is inadmissible because it contradicts the affiant's previous testimony . . . unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse." *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). Those are limited exceptions, and if they do not apply and the affidavit testimony conflicts with the deposition testimony, the later affidavit is disregarded and ignored at summary judgment. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 809, n.1 (7th Cir. 2015). This is entirely sensible. A witness sitting for a deposition is subject to cross examination. A witness's affidavit, prepared in conjunction with a motion for summary judgment (usually drafted by the same lawyers who are simultaneously drafting their briefs in support or opposing summary judgment), is not subject to any cross examination. And as with most instances, testimony subject to cross examination is held in a higher esteem than

untested statements of potentially biased witnesses. *See United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir. 2005) ("Summary judgment would be meaningless if litigants could manufacture genuine issues of material fact through self-serving and unsupported 'admissions' materially different from positions taken in the past.").

With these principles in mind, I'll start with paragraphs 11 and 12 of Cathy Spear's affidavit. Spear worked in Human Resources for Beacon. In the two paragraphs at issue, Spear makes the following statements:

> With fewer Shift Coordinators it was essential for the employee who would fill those roles to have the ability to perform the Essential Job Duties of the position, including Patient Care Delivery duties.

> Thus, following the June 2017 organizational restructuring, it was no longer possible for Beacon to accommodate Shaw's disability by not requiring Shaw to perform the hands-on patient care duties of the Shift Coordinator position because the entire purpose of the organizational restructuring was to address financial issues by (among other things) consolidating positions and hold Shift Coordinators accountable for all of the duties of the position.

[DE 32-1 at ¶¶ 11-2.] Shaw says both paragraphs lack factual support in the record and are not grounded in Spear's personal knowledge. In opposing Shaw's motion to strike, Beacon has filed yet another affidavit from Spear which includes additional information regarding Spear's work for the company and why she would have personal knowledge of staffing issues, job requirements, and Beacon's efforts to cut costs during its restructuring. This leaves the issue of a lack of factual support in the record for Spear's

assertions. Shaw says that this lack of factual support makes Spear's affidavit testimony conclusory and thus impermissible. I agree.

In *Lucas*, the Seventh Circuit refused to consider affidavit testimony (from a plaintiff in an employment racial discrimination case) which asserted "that African-Americans were asked to change rail tires more frequently, work longer sections of the track and were written up for reasons that non-African-Americas were not" without setting forth any times, dates, or places of these occurrences. *Lucas*, 367 F.3d at 726. Spear's affidavit is similarly lacking in enough specifics to be credited at summary judgment. The statements at issue are too conclusory and unsupported and are really nothing more than the legal arguments that Beacon makes in its briefing, recast as factual testimony. They may well be true—I just don't know, and I don't doubt Beacon had a need to restructure—but they are not sufficient in this context. Accordingly, I will strike and not consider paragraphs 11 and 12 of the Spear's affidavit for purposes of deciding the pending motions for summary judgment.

The next affidavit to address is that of Deanna Roberts. Roberts works as the Director of the Medical-Surgical Unit and Nursing Support Services. The first paragraph that Shaw challenges is Paragraph 8. Roberts states that "[t]he ability to do hands-on nursing responsibilities and provide patient care is an essential function of the shift coordinator position." [DE 35-2 at ¶ 8.] Shaw says that testifying as to what is an "essential function" of a job is a legal conclusion and that Roberts's testimony lacks factual support. As discussed later in this opinion, the parties agree that the test of whether something is an essential function depends on the factors listed in 29 C.F.R. §

1630.2(n)(3). That regulation specifies that one of the factors considered is "the employer's judgment" on the matter. 29 C.F.R. § 1630.2(n)(3).

Thus, Roberts opinion that "hands-on nursing" and "patient care" is an essential function of the Shift Coordinator job seems highly relevant, and not itself a legal conclusion, as the relevant regulations specifically note that an employer's judgment is one factor which goes into the determination as to whether a particular function is essential. *See* 29 C.F.R. § 1630.2(n)(3). Likewise, the supplemental affidavit signed by Roberts lists specific types of hands-on nursing care that a Shift Coordinator would be expected to perform. [DE 41-3 at ¶¶ 5-6.] And while I find it somewhat suspect that Roberts needed to file a supplemental affidavit to clarify and provide support for statements made in her affidavit on top of her deposition testimony, it will be allowed in this instance. She is a senior manager in charge of a nursing division for Beacon and thus would clearly have knowledge on the subject. Accordingly, I will not strike paragraph 8 of Roberts's affidavit.

Paragraph 9 of Robert's Affidavit states: "Shaw was unable to perform those essential duties (i.e., hands-on nursing responsibilities and direct patient care) due to her disability." [DE 32-2 at ¶ 9.] Shaw says that this paragraph lacks factual support and worse, conflicts with Roberts' prior sworn deposition testimony. Shaw points to Roberts's deposition where she testified that she never observed Shaw perform or attempt to perform patient care. When asked whether she knew if Shaw could perform "hands-on patient care at the bedside", Roberts responded "I did not know. I had not observed her doing these things." [*See* DE 43 at 4.]

To overcome this rather obvious contradiction, Beacon points to three things. None of them are availing, mostly because none of them even attempt to smooth the obvious discrepancy between what Roberts testified to during her deposition and what she is now saying in her affidavit. Furthermore, this statement is extremely conclusory. Beacon's attempt to justify it by pointing to the letter from Shaw's treating physician which post-dates Roberts's decision not to select Shaw as Shift Coordinator further falls flat. The letter itself is of course admissible, but Beacon cannot have Roberts parrot conclusions in its favor ex ante. Without an explanation as to why this isn't a contradiction or attempt to explain it, I need not weigh in on whether these statements have enough underlying factual support. Accordingly, Paragraph 9 of the Roberts Affidavit will be stricken and not considered for purposes of summary judgment.

Shaw next challenges Paragraphs 11-12 of Roberts's affidavit on similar grounds. Paragraph 11 says: "Prior to June 2017, Beacon accommodated Shaw's disability by not requiring Shaw to perform the hands-on patient care component of her job duties." Paragraph 12 goes on to state:

> Beacon's accommodation of Shaw's disability is illustrated by Shaw's final performance evaluation where Shaw received a score of 'Not Applicable' for the 'Patient Care Delivery' category of essential Job Duties (in other words, Beacon could have given Shaw a score of 'Unacceptable' for the Patient Care Delivery category of essential job duties because Shaw did not perform those duties, which would have lowered Shaw's performance score; but instead, Shaw was assessed a 'Not Applicable' so that the limitations caused by Shaw's disability would not have an adverse impact of Shaw's performance score).

Like with the challenged portions of the Spears' affidavit, this reads more like a regurgitation of Beacon's legal theory rather than a statement from Roberts's own personal knowledge or factual support. For one, besides its own say so, Beacon points to nothing in the record to show that there was in fact any formal accommodation for Shaw. Nowhere in Roberts's affidavit does she say when this supposed accommodation was given or how it was ever documented. And Shaw was not referred to the Employee Health Manager who handled ADA accommodations until *after* Shaw was told she would not be able to stay on as a Shift Coordinator. Furthermore, once again, Roberts's deposition testimony conflicts with her affidavit here. Roberts testified that Shaw did not perform patient care as a Shift Coordinator prior to June 2017 because she only worked 64 hours per pay period and thus did not have time to do work beyond her administrative and clerical work. [Roberts Dep. at 21.] This testimony is not ambiguous, but it conflicts with Paragraphs 11 and 12. Accordingly, Paragraphs 11-12 will be stricken and not considered for purposes of summary judgment.

Paragraph 14 states: "It was also an essential function of the Shift Coordinator position to be able to fill in as a Charge Nurse. Shaw did not perform this duty prior to June 2017." For the same reasons that Paragraph 8 of Roberts's affidavit is permissible (she can give her opinion as to what are essential functions of the job), I will not strike this paragraph of the affidavit. Shaw is of course free to argue this isn't an essential function of the job and point to the evidence which supports her position, such as the fact that Shaw's replacement as Shift Coordinator has never worked as a Charge Nurse in the role. Furthermore, as discussed below, Paragraph 14 can logically be read in

connection with Paragraph 15 and as such is at least partially consistent with Roberts's deposition testimony. It's further undisputed that Shaw did not work as a Charge Nurse while at Beacon, so there is no reason to strike that sentence.

Paragraph 15 states: "I explained that after the organizational restructuring, the Shift Coordinator would be held accountable for assisting the Director with hands-on patient care and filling in for Charge Nurse. As an alternative to filling in for Charge Nurse, I also offered the option of filling in for Patient Flow Coordinator and/or Nursing Supervisor as necessary in an effort to accommodate Shaw's physical limitations." Again, Shaw says that to the extent Roberts is now trying to say she offered Shaw an accommodation to perform the job of Shift Coordinator, she is contradicting her prior deposition testimony. I agree. Roberts testified that she did not even consider providing Shaw an accommodation to perform the Shift Coordinator position. [Roberts Dep. at 55-56.] As such, Paragraph 15 is stricken to the extent it implies that performing the role of Nursing Supervisor or Patient Flow Coordinator instead of a Charge Nurse was a formal or legal *accommodation* for Shaw. But it will not be stricken in full, and I will consider this paragraph to the extent it is offering Roberts's testimony as to what is an essential function of the Shift Coordinator position.

The final challenged portion of the Roberts affidavit is Paragraph 27. It states: "Morauski was ultimately selected to fill the Shift Coordinator position due to her experience in nursing leadership as a House Supervisor (which includes the Nursing Supervisor and Patient Flow Coordinator job assignments), positive relationships with staff and peers, flexibility, and voluntary participation in performance improvement

activities." Shaw's issue here is with the phrasing of Roberts saying why Morauski was "ultimately" selected as Shift Coordinator. I agree there is at least some conflict between Roberts's affidavit and deposition testimony. In her deposition, Roberts testified the same general reasons, but said "most importantly, [for] this role, I needed to pick someone that could perform clinical duties whenever asked to perform them because quality and safety is our number one priority for all patients." [Roberts Dep. at 76.] This is really a quibble about adverb usage, but it is a contradiction. However, to me, Paragraph 27 does not read as a sham, it instead reads more so as an incomplete statement concerning Roberts's reasoning in choosing Mouraski. It will not be stricken but, to the extent it is considered, Roberts's deposition testimony on the same issue will be considered too.

### B. The Parties' Cross Motions for Summary Judgment

With the preliminary issues settled, it is time to address the heart of the matter: the motions for summary judgment. Again, there are two claims at issue in this case: disability discrimination and a failure to accommodate. These are similar but distinct claims. The four elements of a prima facie disability discrimination claim are: (1) the plaintiff is a qualified individual with a disability; (2) the plaintiff was able to meet the employer's legitimate expectations in terms of work performance; (3) the employee was terminated or suffered some other adverse employment action; and (4) the disability motivated the employer's action. *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). The three elements of a prima facie failure to accommodate claim

are: (1) the plaintiff is a qualified individual with a disability; (2) the employer knew of the disability; and (3) the employer failed to reasonably accommodate the disability. *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013) (citing *Kotwica v. Rose Packing Co.,* 637 F.3d 744, 747–48 (7th Cir. 2011)). Thus, both claims require as their first element, that Shaw show she is a "qualified individual with a disability." No one is disputing that Shaw has a disability in the form of her Reynaud's Syndrome and its attendant impairments, so we can set that issue aside.

So, what does "qualified individual" mean? "An individual is qualified if she satisfies the pre-requisites for the position and can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (citations and internal quotation marks omitted). Again, no one disputes that Shaw satisfied the prerequisites for the Shift Coordinator position, she is an RN and worked in that position successfully for over a decade. Thus, it comes down to whether Shaw could perform the essential functions of the job. Beacon says that as a matter of law Shaw could not perform the essential functions of the Shift Coordinator position and for that (and other reasons) it is entitled to summary judgment. Shaw disputes this and even says that she is the one entitled to summary judgment on the failure to accommodate claim, in the process saying that the undisputed facts show she could perform the essential functions of the Shift Coordinator position. As discussed below, I think both parties are overplaying their hands.

Federal regulations include a list of seven non-exhaustive factors that are relevant to determining "whether a particular function is essential." 29 C.F.R. § 1630.2(n)(3). They are: "(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applications for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs." *Id.* The Seventh Circuit has instructed district courts to look to these factors when answering whether a particular function should be considered essential. *See Lenker v. Methodist Hosp.*, 210 F.3d 792, 796 (7th Cir. 2000).

In support of its argument concerning the essential functions of a Shift Coordinator, Beacon relies heavily on *Lenker v. Methodist Hosp.* To be frank, I find Beacon's reliance on this case perplexing, as it strikes me as fatal to its core argument on summary judgment. In that case, the Seventh Circuit affirmed a jury verdict in favor of a hospital, not summary judgment. The posture is important because in *Lerner* the question of essential function laid at the heart of the appeal. The plaintiff, a nurse, argued that lifting a specific amount of weight was not an essential function of his job because it "comprised at most two percent of a nurse's day, that devices were available to assist in lifting patients, and that all nurses were allowed to use their judgment to determine whether they needed assistance in a particular situation and call for other staff to help." 210 F.3d at 796. But on the other end of the spectrum was the hospital's

evidence that it "considered lifting an essential function of the job, that it was part of the job description for staff nurses, that at times, staff shortages or emergencies left a nurse without assistance in a lifting task, and that the need for lifting was not always predicable because patients sometimes fell or needed assistance unexpectedly." *Id.* In short, there was evidence on both sides, and it was up to the jury to make the call.

So too here. Beacon points to both the (partially stricken) Roberts affidavit to say that "Patient Care Delivery" is an essential function and to the written job summary for Shift Coordinators which says the same thing. Shaw responds that despite what Roberts and job description state, in practice that just wasn't the case. She also notes that the person who replaced her as Shift Coordinator testified that she has never had to fill in for a full shift as Nursing Supervisor, Patient Flow Coordinator or Charge Nurse. Shaw also points to evidence that she wasn't completely unable to perform patient care, and that she could perform some of the patient care functions of a Nurse Supervisor. She could walk and stand for prolonged periods of time, push carts and wheelchairs up to 50 pounds, position and lift patients, and provide CPR. [Shaw Aff. ¶ 32-24.] In fact, she does these things at her current job.

Thus, she says there is evidence that extensive patient care was not an essential function but instead de minimus functions of the job. Both parties cite evidence in their favor which bears on the factors contained in 29 C.F.R. § 1630.2(n)(3). This is a very similar situation in *Lenker*. But again, when the Seventh Circuit affirmed judgment in the hospital's favor, it was doing so only after the jury had the opportunity to weigh in. A jury will have the same opportunity in this case.

For this same reason, I find the case before me distinguishable from *Stern v. St. Anthony's Health Center*, 788 F.3d 276 (7th Cir. 2015). In *Stern*, the Seventh Circuit affirmed a district court's grant of summary judgment on ADA claims brought by the former Director of Psychology at a hospital. The plaintiff had been let go because of concerns and evidence of his deteriorating memory which made him unfit for his position and unable to perform the essential clinical and administrative functions of being the hospital's chief psychologist. *Stern*, 788 F.3d at 284. The hospital's determination was based upon the professional evaluation of a neuropsychologist of the plaintiff's choosing who concluded that the plaintiff was not fit to do his job. In opposing summary judgment, the plaintiff pointed to three pieces of evidence: his performance evaluations, testimony from his administrative assistant, and testimony from his wife. *Id.* at 286-287. With regard to the performance evaluation, which pre-dated the onset of his memory loss, that he was performing his job adequately, the evidence was deemed irrelevant, as the inquiry in an ADA discrimination case is whether the employee can perform the essential functions *at the time of his termination*, not at a time preceding it. *Id.* at 287. Likewise, the testimony from the administrative assistant and wife, which tended to show he got his work done "as far as [the administrative assistant] knew", and that his wife observed him doing his job adequately in her opinion, was not enough to rebut the professional opinion of evaluating neurophysiologist. *Id.* at 287-88. Furthermore, the evidence that the plaintiff could continue to perform his job with a reasonable accommodation, was nothing more than "untested opinion/hope." *Id.* at 289. But importantly, unlike here, there was no

challenge as to what the underlying essential functions of the job at issue in *Stern* were. That makes *Stern* uninstructive for deciding this issue in Beacon's favor.

These clear questions of fact on what truly falls within the scope of the Shift Coordinator's "essential functions" is fatal to Shaw's affirmative motion for summary judgment on her failure to accommodate claim. They also prevent me from ruling in Beacon's favor on its main argument. But that isn't Beacon's only argument, and I must address those remaining arguments.

Beacon argues is that Shaw could not perform the essential functions of the job, regardless of its exact scope. It bases this argument primarily upon a letter from Shaw's medical provider Dr. Minnie S. Enriquez who stated on a "Medical Inquiry Form in Response to an Accommodation Request" that Shaw was "unable to do hands-on nursing responsibilities." [DE 31 at 18.] For one, Shaw had her doctor fill out the form *after* Beacon had already terminated her from the Shift Coordinator position, so it's unclear how this form could serve as a basis for why Beacon did not discriminate against Shaw when it terminated her. But in any event, again, my inability to say definitively what the "essential functions" of the Shift Coordinator position are makes it impossible for me to rule on whether or not Shaw could perform them. If the "hands-on nursing responsibilities" referenced by Beacon and Dr. Enriquez (or "Patient Care Delivery" to use the language in the job description) are not essential functions of the job, Shaw's ability to perform them are irrelevant. This argument does not provide a basis to grant summary judgment in Beacon's favor.

Furthermore, Shaw has put forth sufficient evidence to show that Shaw could in fact perform the "Patient Care Delivery" required of a Nursing Supervisor, which is the position she was potentially needing to fill in for from time to time. [DE 36 at 11.] Specifically, she could walk and stand for prolonged periods of time, push carts and wheelchairs up to 50 pounds, position and lift patients, and provide CPR. Her disability doesn't impact her ability to do these things, so long as she can take short breaks to warm herself with hand warmers, or a space heater. [Shaw Aff. ¶ 32-24.] Whether this is in fact the case and whether or not allowing Shaw to take breaks to warm herself would be a reasonable accommodation is for the jury to decide.

Beacon's final argument is that Shaw "refused" to engage in the "interactive process" with Beacon after it terminated her as Shift Coordinator but then took efforts to find her another position. According to Beacon, it was Shaw who rejected the suitable positions it identified and thus it cannot have failed to accommodate her. Shaw says that the fault for any failure in the interactive process wasn't hers, but instead Beacon's. She says that after she was terminated, Beacon offered to have her shadow a Case Manager but offered her nothing in terms of accommodation.

Beacon points to an email Shaw sent in which she stated that her "health issues are going to prevent me from seeking this role" because her hands and feet became numb while shadowing. But Shaw says that shows an incomplete picture. As she testified, when she shadowed the Case Manager position for half a day, she wasn't allowed any breaks or access to a heater to warm up throughout the shift. [Shaw Dep.

149-150.] Thus, she assumed that wasn't an option. As a result, she says, the failure of her potential job as a Case Manager lies with Beacon, not her.

Beacon (specifically Cathy Spear and Lesley Heckaman) then searched for additional possible positions, but their efforts to find Shaw another job focused only on "desk" and "seated" positions—limitations which weren't necessary for Shaw, as she could walk and stand just fine she says. She needed access to heat sources and short breaks, not a chair. In effect, she is arguing that Beacon's efforts were either a sham or misinformed to the point that they were meaningless. While Shaw's evidence here seems weaker, nonetheless she has put forth enough evidence that I cannot grant summary judgment in Beacon's favor based on this argument. For one, as Beacon notes a failure to engage in the interactive process is not in and of itself dispositive of the issue. [*See* DE 31 (citing *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000).] Furthermore, Beacon doesn't explain why it did not offer Shaw access to a heat source while she shadowed the Case Manager position even though it was well-aware of her condition and that she had used a heater in the past. Nor does Beacon say why it would be unreasonable to let Shaw have access to such a heater or why it then limited its search only to sedentary positions. At the same time, it may be the case that seated and sedentary positions were the only ones which would otherwise accommodate Shaw and her disability. In any event, the point is, I cannot say as a matter of undisputed fact that it was Shaw who refused to engage in the interactive process which would entitle Beacon to summary judgment on the failure to accommodate claim.

**Conclusion**

For the foregoing reasons, Plaintiff Benita Shaw's Motion to Strike [DE 34] is GRANTED in part and DENIED in part; Plaintiff Benita Shaw's Motion for Partial Summary Judgment [DE 27] is DENIED; and Defendant Beacon Health System, Inc.'s Motion for Summary Judgment [DE 30] is DENIED.

SO ORDERED on July 19, 2019.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT